IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANE A. COSIANO, | ) | Case No. 1:21-cv-610 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **REPORT AND** |
| | ) | **RECOMMENDATION**[1] |
| Defendant. | ) | |

Plaintiff, Jane A. Cosiano, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Cosiano challenges the Administrative Law Judge's ("ALJ") negative findings, contending

that the ALJ: (i) failed to address whether her Post-Traumatic Stress Disorder ("PTSD") was a

severe impairment; (ii) erred in finding that her fibromyalgia was not a medically determinable

impairment; (iii) erred in finding that her physical impairments did not meet or equal the criteria

of Listing 1.04A; and (iv) misevaluated her subjective symptom complaints.  The ALJ's alleged

Step Two errors were harmless because the ALJ considered those impairments at later steps of

the sequential evaluation.  And although the ALJ gave an inadequate explanation for her Step

Three findings, Cosiano failed to set forth sufficient evidence to establish that she met all the

criteria of Listing 1.04A.  However, because the ALJ failed to apply proper legal standards in

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

evaluating Cosiano's fibromyalgia at Step Four, I recommend that the Commissioner's final decision denying Cosiano's applications for DIB and SSI be vacated and that Cosiano's case be remanded for further consideration.

## I.    Procedural History

Cosiano reapplied[2] for DIB and SSI on October 9, 2018.  (Tr. 277, 284).[3]  Cosiano alleged that she became disabled on July 5, 2013, due to: (i) lower lumbar pain; (ii) herniated lumbar discs; (iii) fibromyalgia; (iv) PTSD; (v) "[d]ifficulty remembering"; and (vi) partial seizure disorder.  (Tr. 277, 284, 309).  The Social Security Administration denied Cosiano's applications initially and upon reconsideration.  (Tr. 102-27, 130-57).  Cosiano requested an administrative hearing.  (Tr. 174-75).

ALJ Catherine Ma heard Cosiano's claims on September 23, 2020 and in a decision dated October 14, 2020 denied Cosiano's claims.  (Tr. 12-26).  In doing so, the ALJ determined at Step Two of the sequential evaluation that Cosiano's fibromyalgia was not a medically determinable impairment and did not address whether her PTSD was a severe impairment.  (Tr. 16).  At Step Three, the ALJ found that Cosiano did not meet the requirements of Listings 1.04, 11.02, 12.04, and 12.06.  (Tr. 17-18).  And at Step Four, the ALJ determined that Cosiano had the RFC to perform light work with the following limitations:

> [Cosiano] can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, and can never climb ladders, ropes, and scaffolds.  [Cosiano] must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving.  [Cosiano is also] [l]imited to … simple, routine task[s], but not at a production rate pace[,] [and] occasional routine workplace changes.

(Tr. 18).

---

[2] Cosiano previously applied for benefits in 2013, claiming a disability onset date of July 5, 2013.  Those applications were denied after ALJ review on January 21, 2016.  Cosiano appropriately concedes that the period of adjudication in this action is from January 22, 2016 onwards.  *See* ECF Doc. 12 at 5; ECF Doc. 13 at 1-2 & 2 n.2.

[3] The administrative transcript appears in ECF Doc. 11.

Based on vocational expert testimony that an individual with Cosiano's age, experience, and RFC could work in such available occupations as marker, garment sorter, and information clerk, the ALJ determined that Cosiano wasn't disabled.  (Tr. 24-26).  On January 29, 2021, the Appeals Council denied further review, rendering the ALJ's final decision the final decision of the Commissioner.  (Tr. 1-3).  On March 17, 2021, Cosiano filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Cosiano was born on January 25, 1972 and was 41 years old on the alleged onset date. (Tr. 102, 277, 284).  She had an eighth-grade education and past work as a cashier/checker and cashier supervisor, which the ALJ determined she was unable to perform.  (Tr. 24, 43-46, 310).

### B.     Relevant Medical Evidence

#### 1.     Physical Impairments[4]

By January 2016, Cosiano's medical history included: (i) seizure disorder; (ii) migraine headaches; (iii) encephalomalacia in the left frontal lobe; (iv) hyperalgesia; (v) paresthesia; (vi) neurofibroma; (vii) disc bulge at L4-L5 with slight caudal extrusion; (viii) disc space narrowing at L5-S1; (ix) degeneration of the L5-S1 disc; (x) retrolisthesis at the L5-S1 level; (xi) cervical lordosis reversal; (xii) lumbar radiculopathy; and (xiii) right hip bursitis.  *See* (Tr. 588, 1109-10, 1119-20, 1125-26, 1132-33, 1138-39, 1161, 1185, 1187, 1189-90, 1329, 1333, 1337, 1360, 1373-74).  She was treated with morphine sulfate, methylprednisolone, vitamin D, lamotrigine, and oxycodone-acetaminophen.  (Tr. 637-38).

---

[4] Because Cosiano agrees that her claim is limited to the period after January 2016, I will limit my description to the medical record to that period.

On January 11, 2016, Cosiano visited Dean C. Pahr, DO, for pain management.  (Tr. 1427).  Cosiano stated that she stayed "quite active" and was doing "well."  *Id.*  However, she also reported moderate pain.  *Id.*  Dr. Pahr diagnosed Cosiano with fibromyalgia, myalgia, and chronic pain syndrome.  *Id.*

On January 14, 2016, Cosiano visited neurologist Marie Tani, MD, reporting back pain, hip pain, and aching in her legs.  (Tr. 636).  Cosiano stated that she experienced hip pain mostly when sitting.  *Id.*  On physical examination, Cosiano walked slowly and slightly bent forward at the waist, with a narrow-based gait; she looked tired and moved slowly; and she had diminished light touch sensation on the right side.  (Tr. 638).  Dr. Tani provided Cosiano a Medrol Dosepak, prescribed ibuprofen, and continued vitamin D supplements and lamotrigine.  (Tr. 639).

On February 18, 2016, Cosiano visited Cynthia Caja, DO, reporting pain rated at 9/10.  (Tr. 1322-23).  Cosiano's physical examination results were unremarkable, except for a positive straight leg test.  (Tr 1323-24).  Dr. Caja assessed Cosiano with vitamin D deficiency, polyarthralgia, and lymphadenitis.  (1322).  Dr. Caja referred Cosiano to a rheumatologist, ordered lab work, and continued medication, adding doxycycline hyclate and Lasix.  *Id.*

On March 17, 2016, Cosiano returned to Dr. Tani, reporting that she felt having more energy after three weeks of medication.  (Tr. 631).  Cosiano reported neck pain; episodes of severe headaches, nausea, and a rash on her left wrist followed by severe pain; increased pain in the center of her back; and a tingly sensation to light touch in her arms and legs.  (Tr. 631, 635).  She stated that it could be "very painful to take a shower due to skin sensitivity, and she may skip showering some days."  (Tr. 631).  Upon physical examination, Cosiano looked tired and had: (i) tenderness across her trapezius muscles; (ii) pain in her mid-back; (iii) diminished light touch sensitivity and increased sensitivity to sharp touch on the right side of her face; (iv) normal

muscle bulk and strength; (v) slightly slower finger tapping on the right; (vi) diminished light and sharp sensation on the right arm and leg; and (vii) steady, narrow-based gait.  (Tr. 633-34). Dr. Tani diagnosed Cosiano with dorsodynia, prescribed ibuprofen, increased the frequency of Cosiano's vitamin D supplement, and ordered lab work.  (Tr. 635).

On March 24, 2016, Cosiano visited Dr. Caja for weight loss counseling.  (Tr. 1315). Cosiano reported pain rated at 8/10, no regular physical activity, and "sit down job."  (Tr. 1318, 1320).  Cosiano's physical examination results were unremarkable.  (Tr. 1320).  During an April 21, 2016 follow-up, Cosiano rated her pain at 7/10 and reported that she took short walks with her neighbor and "does some dancing."  (Tr. 1312-13).  Cosiano's physical examination results were unremarkable.  (Tr. 1313-14).

On June 16, 2016, Cosiano visited Dr. Tani, stating that she "used to cry and rub her legs, which she does not do anymore."  (Tr. 626).  Cosiano reported back, hip, and knee pain and memory lapses.  (Tr. 626, 629).  Upon physical examination, Cosiano did "not appear to be in so much pain."  (Tr. 628).  She also had diminished touch on the right side of the face; "good" strength except slow finger tapping on the right; diminished sensation to light touch in the right arm and leg; and "somewhat" slow walk.  (Tr. 628-29).  Dr. Tani prescribed gabapentin for Cosiano's dorsodynia and continued her other medication.  (Tr. 629).

On June 17, 2016, Cosiano returned to Dr. Caja for a follow-up on her weight loss, reporting that Dr. Pahr had been weaning her off of all her pain medication but that she was having a lot of pain, which she rated at 7.5/10.  (Tr. 1301, 1303-04).  Cosiano also reported that she was exercising.  (Tr. 1303).  Cosiano's physical examination results were unremarkable.  (Tr. 1308).

On July 15, 2016, Cosiano reported to Dr. Caja that she was riding a bike for at least two-to-three miles every night.  (Tr. 1297).  Cosiano rated her pain at "0/10" and had unremarkable physical examination results.  (Tr. 1299).

On September 22, 2016, Cosiano visited rheumatologist Ali Askari, MD, and rheumatologist fellow Miriam Khan, MD, upon Dr. Tani's referral for possible fibromyalgia. (Tr. 400).  Cosiano reported that since 2013 she'd had intermittent numbness, tingling, burning sensation, and myalgias in different areas of her body.  *Id.*  She also reported morning stiffness, alopecia, and chronic fatigue.  *Id.*  Upon physical examination, Cosiano had unremarkable results except tenderness in her hands and lower back.  (Tr. 402).  Cosiano also had trigger points in her cervical, lumbar, and gluteal regions.  (Tr. 406).  Dr. Askari determined that to complete his assessment, he needed to rule out rheumatological disease progress and sacroiliitis.  *Id.* Dr. Khan ordered additional lab work and imaging tests.  (Tr. 405).  Cosiano underwent x-ray examination the next day, the results of which showed mild degenerative changes that were greatest at L5-S1.  (Tr. 395).

On October 18, 2016, Cosiano visited the pain clinic where Dr. Pahr worked and was seen by a registered nurse.  (Tr. 583).  Cosiano reported lower back pain and muscle aches in her legs, rating her pain at 7/10.  *Id.*  Her pain was improved by stretching, walking, and massaging but worsened by prolonged sitting and walking.  *Id.*  She was not currently working and had not slept in three days.  *Id.*  Cosiano was prescribed Percocet.  *Id.*

On December 16, 2016, Cosiano returned to Dr. Tani, reporting that her low back pain was sometimes intolerable despite her pain medication, though her pain benefitted somewhat from Cymbalta (which she had been prescribed for anxiety).  (Tr. 618).  She also reported severe low back pain that radiated down to the back of her legs since Thanksgiving.  *Id.*  Upon physical

6

examination, Cosiano moved slowly due to back pain and she had slightly slow right finger tapping and diminished light touch sensation throughout the right side of her body.  (Tr. 620). Dr. Tani gave Cosiano a Medrol Dosepak for her pain and continued lamotrigine, noting that her seizures remained under control.  (Tr. 621).

On January 17, 2017, Cosiano visited Dr. Pahr, reporting that she was "doing well."  (Tr. 574).  She also reported, however, pain that radiated up her back rated at 9/10 with numbness and tingling in her feet.  (Tr. 582).  Dr. Pahr assessed Cosiano with osteoarthritis, joint pain, fibromyalgia, and chronic pain syndrome and continued Percocet.  (Tr. 574-75).

On March 7, 2017, Cosiano presented to Dr. Askari for a follow-up.  (Tr. 392).  Cosiano reported no improvement in her symptoms from the Medrol Dosepak or steroid injections in her back.  *Id.*  She also reported chronic fatigue; poor sleep; joint and back pain; periodic numbness, tingling, and burning sensation in the lower extremities; and myalgias.  *Id.*  On physical examination, Cosiano had: (i) soft tissue tenderness in the paracervical area, paraspinal area, thighs, and forearms; (ii) tenderness in her hands; (iii) full range of motion and strength; and (iv) intact light touch sensation.  (Tr. 394).  Dr. Askari reviewed Cosiano's x-ray examination results, stating that they revealed minimal right sacroiliac joint sclerosis and disc herniations but did not evince fusion, sacroiliitis, or significant degenerative changes.  (Tr. 392, 399).  Cosiano's lab results all came back negative.  (Tr. 392, 399).  After noting that the evidence did not suggest synovitis, inflammatory disease, auto-immune disease, or sacroiliitis, Dr. Askari determined that the medical findings were consistent with fibromyalgia.  (Tr. 398-99).

On March 30, 2017, Cosiano visited Dr. Tani, reporting that she used an exercise bike and stretching to stay active, but she sometimes felt weak and with no energy.  (Tr. 613).  She stated that Dr. Askari had recommended substituting Lyrica for Cymbalta and denied seizures.

7

*Id.*  She reported headaches, frequent falls, and occasional blurry vision with fibromyalgia flareups.  *Id.*  And she reported a severe flareup of her back pain radiating down both legs.  (Tr. 616).  Upon physical examination, Cosiano had: (i) diminished light touch sensation on the right side of her face and throughout her right limbs; (ii) slightly slower right finger tapping; (iii) narrow-based gait, with slow and stiff walking; and (iv) normal strength and muscle tone. (Tr. 615-16).  Dr. Tani prescribed Lyrica but continued Cosiano on Cymbalta for her mental impairments.  (Tr. 616).

On April 27, 2017, Cosiano returned to Dr. Tani for a follow-up, reporting that Lyrica took the "edge off" of her chronic leg pain but it wore off overnight.  (Tr. 608, 611).  She also reported lower back, hip, knee, and ankle pain with occasional neck and arm ache.  *Id.*  Cosiano denied vision loss or frequent falls.  (Tr. 608).  Upon physical examination, Cosiano had: (i) diminished light and sharp touch sensation throughout the right side of her body; (ii) slow gait, appearing to be in pain and with a limp; (iii) painful heel and toe gait; (iv) normal muscle bulk and strength; and (v) slightly slower right finger tapping and rapid alternating movements. (Tr. 611).  Dr. Tani increased the frequency of Cosiano's Lyrica regimen.  *Id.*

On April 28, 2017, Cosiano visited Dr. Pahr, stating that she was doing "well," her medicine was helping, and she was making "progress."  (Tr. 572).  However, Cosiano reported 9/10 pain.  (Tr. 581).  Dr. Pahr assessed Cosiano with lumbosacral radiculitis, myalgia with fibromyalgia, and chronic pain syndrome.  (Tr. 572).  Dr. Pahr recommended back exercises and continued her medication.  (Tr. 572-73).

On June 21, 2017, Cosiano presented to Dr. Caja with hematuria and increased back pain. (Tr. 1287).  She also reported increased swelling in her legs since starting Lyrica.  *Id.*

8

On June 30, 2017, Cosiano presented to Dr. Tani with continued pain in her lower back that radiated into her buttocks and continued swelling in her legs but improved pain radiating upwards and less swelling in her feet. (Tr. 604). She reported difficulty lifting and crossing her left leg due to pain. *Id.* And she reported that walking was painful. (Tr. 607). Upon physical examination, Cosiano had: (i) impaired light touch sensation throughout the right side of her body; (ii) mildly wide-based gait, and she was slow to get up and walk due to pain; and (iii) normal muscle bulk and strength. (Tr. 606). She could not perform a tandem gait due to low back pain. *Id.* Dr. Tani stated that Cosiano's new back pain and trouble walking might have been due to kidney stones and prescribed ibuprofen while Cosiano waited for her hematuria to resolve. (Tr. 607).

On August 16, 2017, Cosiano visited Dr. Pahr, reporting that she'd spent "quite a bit of time in the pool … doing some pool exercises." (Tr. 571). She also reported constant lower back pain that radiated into her lower left extremity, which she rated at 8/10. (Tr. 580). Her pain was improved by heat/cold and stretches and worsened by "anything." *Id.* Dr. Pahr diagnosed Cosiano with fibromyalgia and chronic pain syndrome and continued medication. (Tr. 571).

On October 2, 2017, Cosiano returned to Dr. Tani, reporting left-sided low back pain, menopause, and left-sided headaches that were "not bad" and responded to Tylenol. (Tr. 600, 603). Cosiano also reported that she was taking care of her mother and did back stretches and a little cleaning. (Tr. 600). She also stated she couldn't walk far without back pain and ibuprofen and Percocet were not helping with the pain. *Id.* Upon physical examination, Cosiano had: (i) diminished light touch sensation on the right side of her face, right arm, and leg; and (ii) normal muscle bulk and strength. (Tr. 602). In describing her gait, Dr. Tani stated that Cosiano walked slowly due to back pain and performed a tandem gait for only a few steps before

9

needing to sit down due to pain.  *Id.*  Dr. Tani provided Cosiano a Medrol Dosepak and encouraged more regular exercise.  (Tr. 603).

On December 1, 2017, Cosiano visited Dr. Pahr, reporting that she "takes care of the house" and went swimming once.  (Tr. 570).  She also reported low back pain and "pops" that radiated down her left lower extremity, which she rated at 9/10.  (Tr. 579).  Cosiano stated that her pain improved with stretches, medication, a heading pad, and a hot shower and worsened with standing, sitting, and walking.  *Id.*  Dr. Pahr diagnosed Cosiano with myalgia with fibromyalgia, generalized pain, and chronic pain syndrome and continued medication.  (Tr. 570).

On January 25, 2018, Cosiano returned to Dr. Tani, reporting pain from the waist down, headaches, and memory lapses.  (Tr. 596).  Upon physical examination, Cosiano walked without obvious pain and had: (i) narrow-based and steady gait; (ii) diminished light touch sensation on the right side of her body; (iii) normal muscle bulk and strength; (iv) slightly slower right finger tapping; and (v) mildly weaker right finger abduction.  (Tr. 598).  Dr. Tani stated that Cosiano was "doing better with improvement in her … pain."  (Tr. 599).  Dr. Tani decreased the dosage and frequency of Cosiano's Lyrica regimen.  *Id.*

On March 6, 2018, Cosiano reported to Dr. Pahr that she was "working very hard at exercising" and that her "[m]edicines make a big difference."  (Tr. 569).  She also reported lower back pain that radiated down her left leg, which she rated at 7/10.  (Tr. 578).  Cosiano stated that her pain improved with medicine, heat, and exercise and worsened with prolonged walking and sitting.  *Id.*  Upon physical examination, Cosiano had pain upon raising her leg that radiated to her left leg.  (Tr. 569).  Dr. Pahr assessed Cosiano with lumbar radiculitis and fibromyalgia and continued medication.  *Id.*

10

On June 1, 2018, Cosiano visited Dr. Tani, reporting that she received lower back injections from Dr. Pahr.  (Tr. 592).  The injections made her realize she had left hip pain.  *Id.*  Cosiano reported that her fibromyalgia flares were "better" (which she attributed to taking vitamin D regularly) and took her son to work.  (Tr. 592, 595)*.*  She also reported headaches.  (Tr. 592).  Upon physical examination, Cosiano had diminished light touch sensation on the right side of her body; (ii) normal bulk and strength; (iii) weaker finger abduction on the right and slightly slower right finger tapping; and (iv) narrow-based and steady gait.  (Tr. 594).  Dr. Tani decreased Cosiano's Lyrica dosage due to abdominal bloating and constipation.  (Tr. 595).

On June 21, 2018, Cosiano visited Dr. Pahr, reporting lower back pain that radiated to her left leg and left hip pain.  (Tr. 568, 577).  She also reported pain across her back, neck, and shoulders.  (Tr. 568).  Cosiano reported 8/10 pain, and her pain ranged from 0/10 to 10/10 over the previous month.  (Tr. 577).  Cosiano reported that her pain improved with stretches and worsened with driving and housework.  *Id.*  Cosiano stated she only got 6% improvement with injections and requested a TENS unit.  *Id.*  Dr. Pahr continued medication and stated that he would try to get a TENS unit.  (Tr. 568, 577).

On September 24, 2018, Cosiano returned to Dr. Pahr, reporting that she "does well with medicine."  (Tr. 567).  She reported low back pain that radiated down her buttocks to her left leg, which she rated at 8/10.  (Tr. 576).  Her pain was improved by stretches, an ice pack, and a pillow and worsened with sitting and standing.  *Id.*  Cosiano stated she did leg lifts and back stretches for exercise.  *Id.*  Dr. Pahr continued medication.  (Tr. 567, 577).

On December 11, 2018, Cosiano reported to Dr. Pahr that she "does reasonably well."  (Tr. 671).  She also reported back pain and increased pain on her left side.  (Tr. 671).  Upon

examination, Cosiano had tightness with straight leg raising.  *Id.*  Dr. Pahr stated he would like to get injections approved but wanted Cosiano to do some physical and water therapy first.  *Id.*

On March 14, 2019, returned to Dr. Pahr for a follow-up.  (Tr. 666).  Cosiano rated her pain at 7/10 and stated that it was improved by the TENS unit, ice, and heat and aggravated by activity, sitting, standing, and prolonged walking.  (Tr. 666-67).  Upon physical examination, Cosiano had unremarkable results, except for "back pain with limited mobility and strength." (Tr. 667).  Dr. Pahr refilled Cosiano's medication and issued a new referral to physical and water therapy.  (Tr. 668).

On May 14, 2019, Cosiano visited Sarah C. Meisel, PT, for a physical therapy evaluation. (Tr. 1199).  Cosiano reported low back pain and fibromyalgia pain that usually affected her lower extremities and sometimes her whole body with a bad flareup.  *Id.*  Cosiano reported that her fibromyalgia flares could be "bad" at night and could take 1.5 hours to get ready in the morning.  *Id.*  She described her pain as intense burning that could occur with a blowing wind or movement of her hair.  *Id.*  She stated showering could be difficult with a bad flareup, as the water would hurt.  (Tr. 1200).  Cosiano stated that a bad fibromyalgia flare could also cause flu-like symptoms for two days, and she avoided things due to fear of falling from her shooting pain. (Tr. 1199).  Cosiano also reported random shooting pain in her feet every few months and daily muscle soreness.  *Id.*  Cosiano rated her pain at 6/10 at its best and 9-10/10 at its worst and stated she avoided stairs.  (Tr. 1199-1200).

Upon physical therapy examination, Cosiano had: (i) normal upper extremity range of motion and strength; (ii) normal left extremity range of motion; (iii) 4/4 hip flexion and knee extension; (iv) 3/4 hip abduction and 4-/4 adduction with "hooklying"; (v) lumbar spine rotation within functional limitations; (vi) grossly limited and guarded (50%) active lumbar range of

motion, with painful movements; (vii) cervical spine active range of motion within functional limitations but painful and guarded; (viii) normal posture; (ix) positive straight leg raise test; (x) tenderness in the lumbar paraspinal and upper back areas; (xi) slow and guarded bed mobility; and (xii) slow and guarded gait. (Tr. 1200-02). Physical Therapist Meisel stated that Cosiano had "Good" rehabilitation potential and would benefit from skilled physical therapy. (Tr. 1202).

On May 14, 2019, Cosiano also visited Dr. Pahr for a follow-up, reporting that she'd fallen in April, hurt her right knee, and broken her left great toe. (Tr. 1279). Cosiano rated her pain at 5/10 and expressed no concern with her ability to perform activities of daily living. (Tr. 1280). Upon physical examination, she had widespread pain without deficits and tightness with straight leg raising. *Id.*

On June 20, 2019, Cosiano underwent MRI examination of her lumbar spine, the results of which showed: "New large disc herniation at L5-S1 predominantly to the left of midline with compression upon the descending left S1 nerve root." (Tr. 672).

On July 1, 2019, Cosiano visited Alan Hoffer, MD, for a neurosurgical evaluation. (Tr. 1378). Cosiano reported low back pain that radiated through her buttock down her leg to the top of her foot, as well as foot numbness. *Id.* She denied relief from medication, nerve blocks, or physical therapy. *Id.* Cosiano rated her pain at 10/10, which was: (i) minimally exacerbated by standing, walking, driving, bending, lifting, rising from a seated position, coughing, and housework; (ii) markedly worse with sitting, lying down, and sleeping; and (iii) relieved with walking and changing positions and heat, ice, and opioid analgesics. *Id.* Cosiano further reported that she was unable to work, enjoy life, houseclean, and shop. *Id.* Cosiano stated, however, that she could groom, maintain personal hygiene, dress, feed herself, walk

13

independently, climb stairs unassisted, and transition from bed/chair.  (Tr. 1379).  A review of symptoms was positive for: (i) tiredness; (ii) blurred vision; (iii) muscle weakness and cramps; (iv) joint swelling/stiffness; (v) limb pain/swelling; (vi) lower extremity edema; (vii) back, hip, and groin pain; (viii) headaches, seizures, numbness, tingling, and limb weakness; (ix) difficulty waking; and (x) memory lapses.  (Tr. 1378-79).

Upon physical examination, Cosiano had: (i) very mild tenderness in the low lumbar region; (ii) full right leg strength; and (iii) no ankle reflex.  (Tr. 1381).  Testing on Cosiano's left leg was "somewhat" limited by her pain.  *Id.*  Dr. Hoffer stated that Cosiano's clinical presentation was consistent with lumbar radiculopathy from nerve root compression from a herniated disc and recommended a left-sided L5-S1 hemilaminectomy and discectomy.  *Id.*

On July 2, 2019, Cosiano was discharged from physical therapy in light of her pending surgery.  (Tr. 1195).  On July 18, 2019, Cosiano visited Nicholas J. Zielinski, PA-C, for a medication follow-up.  (Tr. 1440).  She reported her pain at 8.5/10.  (Tr. 1441).  Her physical examination results were unremarkable.  *Id.*  On July 19, 2019, Cosiano underwent surgery.  (Tr. 681-82).

On July 25, 2019, Cosiano visited PA Zielinski for a post-surgery follow-up.  (Tr. 1443).  Cosiano reported "greatly reduced radicular symptoms" and rated her pain at 8/10.  (Tr. 1443).  Her physical examination results were unremarkable.  (Tr. 1444).  PA Zielinski prescribed Percocet for her postoperative pain.  *Id.*

On August 21, 2019, Cosiano returned to Dr. Hoffer, reporting that she was doing better than before her surgery.  (Tr. 1382).  Cosiano reported that her left leg pain "completely resolved," though she had residual numbness in her toes.  *Id.*  She reported that since surgery she resumed her activities of daily living.  *Id.*

On August 28, 2019, Cosiano visited PA Zielinski for a follow-up.  (Tr. 1446).  Cosiano reported that she got into a car accident the previous weekend but did not seek emergency treatment.  (Tr. 1446-47).  She reported pain rated 7/10 in her back and denied trouble walking.  *Id.*  Upon physical examination, Cosiano had: (i) mild limitations to her neck range of motion; (ii) normal upper extremity strength, reflex, and sensation; (iii) mild cervical paraspinal tenderness; and (iv) muscle spasm in her scapular spine.  (Tr. 1447).  PA Zielinski assessed Cosiano with chronic pain syndrome, fibromyalgia, cervical radicular pain, cervicalgia, and acute myofascial pain.  *Id.*  PA Zielinski refilled Cosiano's pain medication, administered a trigger point injection, and ordered cervical x-rays.  (Tr. 1447-48).

Between September 25, 2019 and September 16, 2020, Cosiano visited PA Zielinski on a monthly basis.  *See* (Tr. 1392-1426, 1440-62).  On September 25, 2019, Cosiano reported 5/10 pain in her lower back and right knee and denied trouble walking.  (Tr. 1451).  Cosiano's physical examination results were similar to her August 28, 2019 visit, except she additionally had trapezius tenderness on the left side and mild crepitus with motion in her right knee.  (Tr. 1451-52).  PA Zielinski refilled Cosiano's medication and recommended ice, heat, and rest for her knee.  (Tr. 1452).

On October 23, 2019, Cosiano reported to PA Zielinski that Dr. Hoffer had told her she could increase her walking activities.  (Tr. 1454).  Cosiano stated that she still had axial pain; and walking and prolonged standing sometimes exacerbated her lumbar region.  *Id.*  Cosiano rated her pain at 8/10.  *Id.*  Cosiano's physical examination results were unremarkable.  (Tr. 1454-55).  And PA Zielinski refilled Cosiano's pain medication.  *Id.*

On November 20, 2019, Cosiano reported to PA Zielinski that she had difficulty walking and lower back pain rated at 8/10.  (Tr. 1457).  Her physical examination results were

15

unremarkable, except for mild crepitus with motion in her right knee.  (Tr. 1457-58).  PA Zielinski refilled Cosiano's pain medication issued a handicapped parking placard.  (Tr. 1458).

On December 18, 2019, Cosiano reported to PA Zielinski that she had no difficulty waking and that her chronic conditions were relatively well controlled with medication.  (Tr. 1460).  She also reported that her right knee pain increased, and she had fever sign, difficulty with stairs, and intermittent swelling.  *Id.*  Cosiano rated her pain at 7/10.  *Id.*  Her physical examination results were similar to those of her November 20, 2019 visit.  (Tr. 1460-61).  PA Zielinski refilled Cosiano's pain medication and administered a steroid injection.  (Tr. 1461).

On January 20, 2020, Cosiano reported to PA Zielinski that her lumbar symptoms were relatively stable, and her right knee injection provided "great" relief.  (Tr. 1424).  She also reported incidents of popping with "electrical type feeling" and continued knee pain.  *Id.*  Cosiano rated her lower back pain at 8/10.  *Id.*  Her physical examination results were unremarkable.  (Tr. 1425).  PA Zielinski refilled Cosiano's medication and provided a topical anti-inflammatory for her knees.  *Id.*

On February 17, 2020, Cosiano reported to PA Zielinski that she had aching in the lumbar region and rated her lower back pain at 8/10.  (Tr. 1421).  Cosiano also reported that the topical anti-inflammatory worked well.  *Id.*  Her physical examination results were unremarkable.  (Tr. 1422).  PA Zielinski refilled her medication.  *Id.*

On March 17, 2020, Cosiano reported to PA Zielinski that she was struggling with her medication.  (Tr. 1418).  She also stated that her pain (rated at 7/10) was not debilitating to her and she was able to function "moderately."  *Id.*  Her physical examination results were unremarkable, and PA Zielinski refilled her medication.  (Tr. 1418-19).

On April 15, 2020, Cosiano reported to PA Zielinski that she had no difficulty with activities of daily living or walking.  (Tr. 1415).  She reported her pain at 7/10, and PA Zielinski refilled her medication.  (Tr. 1416).

On May 15, 2020, Cosiano reported to PA Zielinski that she had increasing hip pain and wanted injections for the pain.  (Tr. 1412-13).  She denied difficulty with activities of daily living or walking and rated her pain at 6/10.  *Id.*  PA Zielinski refilled Cosiano's medication and administered a bursa injection.  (Tr. 1409, 1413).

On June 10, 2020, Cosiano reported to PA Zielinski that the injection provided "great relief" and rated her lower back pain at 8/10.  (Tr. 1405).  She denied difficulty walking.  *Id.*  Her physical examination results were similar to those of her December 18, 2019 visit.  (Tr. 1405-06).  PA Zielinski refilled Cosiano's medication, noting that Cosiano was relatively stable.  (Tr. 1406).

On July 15, 2020, Cosiano reported to PA Zielinski pain in her Achilles heel and that her medications were keeping her chronic symptoms moderately controlled.  (Tr. 1402-03).  Cosiano rated her lower back pain at 8/10.  (Tr. 1403).  Upon physical examination, she had slightly antalgic gait and mildly tender Achilles heel.  *Id.*  PA Zielinski refiled Cosiano's medication, administered a bursa injection, and ordered x-rays.  (Tr. 1400-01, 1403).

On August 12, 2020, Cosiano reported to PA Zielinski that she had no difficulty walking and she had great relief with injections for two-to-three days.  (Tr. 1396).  She reported small variations in her heel pain.  (Tr. 1396-97).  Cosiano rated her lower back pain at 6/10.  (Tr. 1397).  Upon physical examination, Cosiano had "[e]xquisite tenderness to the calcaneal superficial bursal region."  (Tr. 1397).  PA Zielinski refilled Cosiano's medication referred her to a podiatrist.  (Tr. 1397-98).

17

On September 16, 2020, Cosiano reported to PA Zielinski that she had lower back pain that radiated to her legs, rated at 8/10. (Tr. 1392). She also reported that her right leg sometimes gave out. *Id.* She rated her pain at 8/10. (Tr. 1393). Upon physical examination, Cosiano had lower back range of motion within functional limitations and limited secondary to pain, paraspinal tenderness, negative straight leg raise test, and normal gait. (Tr. 1393). PA Zielinski refilled Cosiano's medication. (Tr. 1394).

### 2.    Mental Impairments

Cosiano's medical history in January 2016 also included panic disorder without agoraphobia and depression with anxiety. (Tr. 637). On January 14, 2016, Cosiano reported to Dr. Tani that she'd put herself on a waitlist for anxiety treatment. (Tr. 636). Meanwhile, she reported depression and anxiety symptoms to Dr. Tani and Dr. Caja. (Tr. 631, 626, 1323).

On July 25, 2016, Cosiano visited Signature Health and completed a mental health assessment. (Tr. 995). Cosiano stated that she had a "horrible" childhood, marked by emotional abuse, the loss of her brother, and poverty. (Tr. 996). Cosiano reported that from 1988 to 1990 she was married to a man who beat her and once locked her in a room and tried to set the house on fire. *Id.* She remarried and divorced her husband of 14 years in 2011 for hazardous spending and infidelity. *Id.* Cosiano stated she lived with her boyfriend and two of her three children, the youngest of whom had homicidal ideations against her. *Id.* Cosiano reported crying easily, trouble eating and sleeping, poor motivation, isolation, and a history of hearing voices. *Id.* Cosiano was tentatively diagnosed with unspecified depressive disorder with psychotic features, bipolar disorder with psychotic features, and PTSD and recommended for psychiatric evaluation. *Id.*

On August 6, 2016, Cosiano visited Cristina Canella, NP, for a psychiatric evaluation. (Tr. 1077).  Cosiano repeated her past traumatic experiences, adding that her siblings used to "torture" her, that she had been inappropriately touched by her father when she was 12 years old, and that her mother and ex-husband made her have an abortion.  (Tr. 1081).  Cosiano stated that she'd had anxiety all of her life, which had been worsening since she had a workplace injury three years earlier.  *Id.*  Cosiano stated that she worried all the time, and described the progression of her anxiety as a feeling of warmth, heart pounding, hand numbness, detachment, falling over, and encroachment.  *Id.*  She reported daily panic attacks lasting a few minutes, which she treated with Klonopin.  *Id.*  Cosiano also reported flashbacks, nightmares, periods of disassociation, and periods of irritability due to "timeloss."  *Id.*  Cosiano stated that if she heard her first husband's voice, she'd shut down and run.  *Id.*  On mental status examination, Cosiano had unremarkable results.  (Tr. 1079).  Nurse Practitioner Canella prescribed Remeron.  (Tr. 1082).

On August 2, 2016, Cosiano began seeing Bridget Verma, LSW, for weekly counseling sessions.  (Tr. 749-53).  In her sessions, Cosiano reported that she suffered "extreme guilt" over her siblings' and her eldest son's abuse.  (Tr. 758).  Cosiano reported that her youngest son reminded her of her first husband, which triggered flashbacks.  (Tr. 753, 758).  Cosiano reported "forgetting a lot," feeling "in a daze at times," and "crying for no reason."  (Tr. 768).  When unable to get a refill on her medication, Cosiano appeared "very emotional."  (Tr. 773).  She reported attending a Halloween party at which she had a "great time" interacting with her in-laws.  (Tr. 783).  She reported a flashback of her father holding her down with dental floss stretched over her neck, which she was able to get through with treatment resources.  (Tr. 793).  And she reported continued problems with her boyfriend.  (Tr. 798, 808).  Cosiano's mental

status exams from August 2, 2016 through December 28, 2016 were unremarkable, except for tearfulness.  (Tr. 749-50, 754-55, 759-60, 764-65, 769-70, 774-75, 779-80, 784-85, 789-90, 794-95, 799-800, 804-05).

On October 13, 2016, Cosiano visited Nurse Practitioner Canella, reporting hallucinations with Remeron.  (Tr. 1001).  She also reported a fibromyalgia flareup that felt like third-degree burns all over her body.  *Id.*  On mental status exam, Cosiano had unremarkable results.  (Tr. 999-1000).  Nurse Practitioner Canella replaced Remeron with Cymbalta.  (Tr. 1001).

On December 9, 2016, Cosiano began receiving psychiatry care from Denise Flynn, NP, reporting continuing anxiety and that she felt "stable" on her current medication.  (Tr. 1011).  On mental status examination, Cosiano had unremarkable results, except depressed mood and limited insight.  (Tr. 1009-10).  Nurse Practitioner Flynn continued medication.  (Tr. 1011).

Cosiano continued to see Counselor Verma from January 13, 2017 through March 13, 2017.  *See* (Tr. 809-43).  Cosiano reported crying spells, nightmares, and continued issues with her boyfriend.  (Tr. 813, 818, 828, 833, 838).  On February 27, 2017, Cosiano reported at 45-minute crying spell, increased anxiety, and depression because of her pain and being denied benefits.  (Tr. 838).  She also reported that her memory continued to deteriorate, and she had trouble remembering "almost anything."  *Id.*  On March 13, 2017, Cosiano stated that she managed her pain with caring for her mother.  (Tr. 843).  Cosiano's mental status examination results during this period were unremarkable.  *See* (Tr. 809-10, 814-15, 819-20, 824-25, 829-30, 834-35, 839-40).

On February 20, 2017, Cosiano reported to Nurse Practitioner Flynn that she felt "stable" on her current medication but still had continuing anxiety and depressed mood.  (Tr. 1016).  On

mental status exam, Cosiano's results were similar to her December 9, 2016 visit.  (Tr. 1014-15).
Nurse Practitioner Flynn increased her Cymbalta dosage, noting that Cosiano was "stable" on her
current medication.  (Tr. 1016).

On March 30, 2017, Cosiano started seeing Angela Grey, LPCC, for counseling.  (Tr.
853).  Cosiano completed a PTSD symptom screening, the results of which suggested "severe"
symptoms.  *Id.*  Through September 5, 2017, Cosiano reported high levels of distress and
continued issues with her boyfriend, resulting in their breakup.  (Tr. 858, 863, 878, 898, 908,
913, 923).  On April 18, 2017, Cosiano reported a flashback triggered by an innocuous
interaction with a neighbor "so severe she dropped to her knees."  (Tr. 868).  In June 2017,
Cosiano reported nightmares, talking in her sleep, and increased anxiety.  (Tr. 888, 893).  On
September 5, 2017, Cosiano's PTSD score had dropped, and she endorsed improvement.  (Tr.
923).  Cosiano's mental status exam results during this period were unremarkable, except for
anxious, depressed, and tearful mood and overwhelmed attitude.  *See* (Tr. 855, 860, 865, 870,
875, 880, 885, 890, 895, 900, 905, 910, 914-15, 919-20).

Meanwhile, on April 6, 2017, Cosiano reported to Nurse Practitioner Flynn that her
depression had improved but she still had tearful episodes.  (Tr. 1021).  She also reported relief
with counseling.  *Id.*  On mental status exam, Cosiano had unremarkable results except depressed
mood and limited insight.  (Tr. 1019-20).  Nurse Practitioner Flynn noted that Cosiano's
condition was "stable" with her current medications and continued medication.  (Tr. 1021).

On July 7, 2017, Cosiano reported to Nurse Practitioner Flynn that her depression had
improved since the increase in dosage of Cymbalta.  (Tr. 1033).  She also reported periods of
sadness and crying spells.  *Id.*  Cosiano's mental examination results were similar to those of her

April 6, 2017 visit. (Tr. 1031-32). Nurse Practitioner Flynn determined that Cosiano's mood was "less depressed" and continued medication. (Tr. 1033).

After a gap in treatment, Cosiano returned to Counselor Grey on December 21, 2017, and continued to see her regularly until December 19, 2018, when Cosiano discontinued counseling. *See* (Tr. 928-94). On December 21, 2017, Cosiano reported nightmares, hypervigilance, and "extremely severe" anxiety. (Tr. 928). She later entered into a new relationship and confronted her ex-husband, which had helped her stress "significantly." (Tr. 933, 938, 943). Cosiano reported a reduction in her flashbacks. (Tr. 949). Cosiano reported trauma related to caring for her mother, who had dementia. (Tr. 989). And at her last counseling session, Cosiano was tearful and reported feeling overwhelmed with 10/10 pain levels and family demands. (Tr. 994). Cosiano's mental status exam results for this period also included overwhelmed attitude and depressed, anxious, and tearful mood. (Tr. 925, 930, 935, 940, 946, 951, 956, 961, 966, 971, 976, 981, 986, 991).

Between January 2, 2018 and May 8, 2018, Cosiano also received psychiatric treatment with Nurse Practitioner Flynn. (Tr. 1045-64). Cosiano reported that there was "too much stress in her life." (Tr. 1045-46, 1052). After starting treatment with Buspar, Cosiano started to report less anxiety and improved mood and Nurse Practitioner Flynn assessed Cosiano with "stable mood." (Tr. 1052, 1057-58, 1063-64). Cosiano's mental status exam results for this period were unremarkable except for depressed mood and limited insight. (Tr. 1043-44, 1049-50, 1055-56, 1061-62).

On June 1, 2018, Cosiano reported to Dr. Tani that she had anxiety with panic attacks, as well as nightmares with bad flashbacks, and she denied depression. (Tr. 592, 595). Dr. Tani prescribed clonazepam. (Tr. 595).

After a gap in treatment due to a lack of insurance, Cosiano returned to Nurse Practitioner Flynn on January 10, 2019.  (Tr. 1069-70).  Cosiano reported that she'd been off medication with increased mood lability, with depressed mood being most often.  (Tr. 1069).  Nurse Practitioner Flynn assessed Cosiano with "stable mood" and restarted her medication.  (Tr. 1070).  During a May 20, 2019 follow-up, Cosiano reported continued stress and an inability to access counseling services due to insurance limitations.  (Tr. 1075-76).  Nurse Practitioner Flynn assessed Cosiano with "stable mood," refilled her medication, and referred her for counseling.  (Tr. 1076). Cosiano's mental examination results for this period were unremarkable except for depressed mood and limited insight.  (Tr. 1066-67, 1073-74).

From July 18, 2019 until September 16, 2020, repeatedly demonstrated to PA Zielinski slightly depressed mood and otherwise unremarkable mental status exam results.  *See* (Tr. 1393, 1395-97, 1400, 1403, 1405, 1418, 1421, 1424, 1451-52, 1441, 1444, 1446-47, 1454, 1457, 1460).

### C.  Relevant Opinion Evidence

#### 1.  Physical Impairments

##### a.  Treating Source – Marie Tani, MD

On October 24, 2018, Dr. Tani completed a questionnaire at the request of the Social Security Administration.  (Tr. 585-87).  Dr. Tani stated that Cosiano's seizures were controlled but her anxiety and pain were not.  (Tr. 587).  Dr. Tani stated that Cosiano suffered from "severe anxiety" that affected her ability to concentrate, communicate, and follow directions.  *Id.* Dr. Tani also stated that Cosiano's pain limited her ability to "stand, walk, bend, stoop, and lift." *Id.*

23

On June 25, 2020, Dr. Tani prepared a "Fibromyalgia Medical Source Statement," in which she left blank all questions concerning functional limitations.  (Tr. 740-43).  Dr. Tani also prepared a "Seizures Medical Source Statement," in which she also left blank all questions concerning functional limitations.  (Tr. 745-48).  Dr. Tani stated that Cosiano hadn't had a seizure since November 2010 and that Cosiano's seizures were well controlled.  (Tr. 745).

### b.  State Agency Consultants

On November 25, 2018, Steve E. McKee, M.D., reviewed Cosiano's medical record and determined that they did not clearly show a deterioration of Cosiano's condition, such that her new evidence was not material.  (Tr. 110).  Dr. McKee, thus, adopted the RFC assessed in the January 21, 2016 ALJ decision, that Cosiano could perform light work, except: (i) she could occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs; (ii) she could never climb ladders, ropes, and scaffolds; and (iii) she had to avoid hazards, such as unprotected heights, moving machinery, and commercial driving.  (Tr. 87-88, 110).  On April 29, 2019, Stephen Sutherland, MD, likewise adopted the January 21, 2016 RFC.  (Tr. 153).

### 2.  Mental Impairments

On November 27, 2018, Janet Souder, PsyD, reviewed Cosiano's medical records and determined that they did not clearly show a deterioration of Cosiano's condition and adopted the January 21, 2016 mental RFC, that Cosiano could: (i) perform simple, routine, repetitive tasks that had brief instructions; (ii) perform goal-oriented tasks; (iii) not work at a production rate pace; and (iv) tolerate occasional changes that were adequately explained.  (Tr. 111).  On May 5, 2019, Sandra Banks, PhD, likewise adopted the January 21, 2016 mental RFC.  (Tr. 154).

### D.    Relevant Testimonial Evidence

Cosiano testified at the ALJ hearing.  (Tr. 46-57).  Cosiano testified that her back surgery only improved her back condition as it related to pain radiating into her leg.  (Tr. 47-48).  Cosiano stated she still had nerve damage that caused pain in her feet and numbness in her toes, which was worse when her fibromyalgia flared up.  (Tr. 47).  Cosiano testified that Cymbalta helped with her fibromyalgia, but it didn't alleviate the severity of her pain when a flareup occurred.  (Tr. 48-49).  Cosiano stated her ability to work was also affected by "fibro fog," which affected her short-term memory.  (Tr. 49).

Cosiano testified that the most she could lift was an empty crockpot or a gallon of milk.  (Tr. 53).  She stated that she could walk 15 to 20 minutes before needing to rest, and she'd need to rest for at least 15 minutes.  (Tr. 54).  Cosiano stated that she could sit for approximately 15 minutes before needing to stand up or move around.  *Id.*  When she sat, she needed to elevate her legs.  *Id.*  The longest she'd tolerated sitting in a car was 35 minutes.  (Tr. 55).  And the most she could limb was four steps.  (Tr. 69).

Cosiano testified that she only showered when someone was in the house because she was afraid of falling.  (Tr. 49-50).  She could fold clothes so long as she was sitting on the bed and did not need to bend.  (Tr. 50).  Cosiano stated her cooking was very limited by her ability to lift.  (Tr. 49).  She could not lift the laundry basket to do laundry, nor could she bend to use the dishwasher.  (Tr. 49-50).  She could dust, but only at waist level.  (Tr. 50).  Cosiano stated she was unable to mop or vacuum, but she could shop if she did not need to bend and the item was not heavy.  (Tr. 49-50).

Cosiano testified that on a typical day, she got up and made herself breakfast, took a shower, dusted, watched television, and went to the back porch.  (Tr. 52).  She also took naps

every two hours.  *Id.*  Her hobbies consisted of looking at her flower bed and reading recipe books.  (Tr. 55).

Cosiano testified that she played PlayStation with her son, but she could not sit for very long.  (Tr. 51).  She could play about ten minutes.  *Id.*  Cosiano testified she would visit her father-in-law once per week but would need to come back after about an hour because she didn't want to be seen crying.  (Tr. 52).  She didn't see other family members because she couldn't be in a car for very long.  *Id.*  She also testified she walked her dog, but she couldn't make it past five houses before needing to turn around.  (Tr. 52-53).

Cosiano testified that she had daily crying spells, which could last almost an hour.  (Tr. 55-56).  Her panic attacks did not happen "too often."  (Tr. 57).  And she testified that she constantly misplaced things and could not recall what she'd said ten minutes earlier.  (Tr. 57-58).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-

weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

**B.      Step Two: PTSD**

Cosiano argues that the ALJ failed to apply proper legal standards when she failed to determine whether Cosiano's PTSD was a severe impairment. ECF Doc. 12 at 20-21. Cosiano argues that her PTSD rose to the level of a severe impairment, given that: (i) she received treatment for PTSD; (ii) her PTSD screening was suggestive of "severe symptoms"; (iii) she

described in her testimony a PTSD episode; and (iv) the medical record documented symptoms that included lengthy crying spells, intrusive thoughts, and nightmares.  ECF Doc. 12 at 21.[5]

The Commissioner responds that any error in the ALJ's consideration of Cosiano's PTSD at Step Two was harmless because the ALJ considered her PTSD when she determined Cosiano's RFC.  ECF Doc. 13 at 18-19.  The Commissioner argues that Cosiano hasn't established a basis for remand because she hasn't articulated what prejudice she suffered as a result of the ALJ's analysis.  ECF Doc. 13 at 19.

In her reply brief, Cosiano argues that she was harmed by the ALJ's failure to consider PTSD as a severe impairment because her PTSD symptoms suggested greater limitations in her ability to interact with others and maintain concentration and pace than the ALJ found at Step Three.  ECF Doc. 14 at 4.  Cosiano also argues that the ALJ's Step Two error also affected the ALJ's RFC formulation; and had her PTSD been properly considered, the RFC would have included greater limitations in her ability to interact with others or stay on-task.  ECF Doc. 14 at 4-5.

At Step Two, a claimant must show that she hast *at least one* "severe" medically determinable impairment.  20 C.F.R. § 404.1520(a)(4)(ii), (c); SSR 85-28, 1985 SSR LEXIS 19, at *7-8.[6]  This is a threshold inquiry "intended to screen out totally groundless claims."  *Nejat v.*

---

[5] In making her Step Two argument, Cosiano states in passing that the ALJ "failed to perform any evaluation under Listing 12.15 (trauma and stressor-related disorders)."  ECF Doc. 12 at 20.  Cosiano hasn't developed this one-line statement anywhere else in her opening brief.  *See generally* ECF Doc. 12. In her reply brief, she clarifies that the ALJ's failure to consider her PTSD a severe impairment infected the ALJ's analysis at subsequent steps of the sequential evaluation, making the error harmful.  ECF Doc. 14 at 4-5.  I shall, therefore, treat Cosiano's one-line sentence in her opening brief as an argument for why the ALJ's Step Two error was harmful.  To the extent she meant to raise a Listings challenge, it is forfeited – both for having raised it for the first time in reply and for raising it perfunctorily.  *Williamson v. Recovery Ltd. P'ship*, 931 F.3d 608, 621 (6th Cir. 2013); *Colvin v. Comm'r of Soc. Sec.*, No. 4:18CV1249, 2019 U.S. Dist. LEXIS 168743, at *11 (N.D. Ohio Sept. 30, 2019).
[6] Although this case concerns both DIB and SSI benefits, the regulations that govern them are generally identical to one another; thus, I cite only to the regulations governing DIB applications.  *Compare* 20 C.F.R. § 404.1501 *et seq.*, *with* 20 C.F.R. § 416.901 *et seq.*

*Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quotation marks omitted).  If the

claimant does not meet this Step Two burden, the claimant is categorically *not* disabled.  20

C.F.R. § 404.1520(c).  But if she does, the ALJ must consider all *all of her impairments* (even

those that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F.

App'x at 576.  And so long as the ALJ considered all the claimant's impairments in the other

steps, any Step Two error is harmless.  *Id.* at 577.

The ALJ applied proper legal standards in her Step Two analysis of Cosiano's mental

health impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  At Step Two, the ALJ found

that Cosiano's anxiety and depression were both "severe impairments"; but the ALJ did not find

similarly with respect to Cosiano's PTSD.  (Tr. 16).  The ALJ didn't even mention Cosiano's

PTSD at all in her Step Two analysis.  *See* (Tr. 16).  But "[t]he regulations do not require the

ALJ to designate each impairment as 'severe' or 'non-severe.'"  *Jones v. Comm'r of Soc. Sec.*,

933 F. Supp. 2d 934, 948 (N.D. Ohio 2013).  Once the ALJ determined that Cosiano had one

severe impairment, the ALJ could, consistent with the regulations, move on to the remaining

steps without analyzing whether Cosiano's remaining impairments were "severe," provided the

ALJ considered *all* of her impairments in the remaining steps.  *See id.*; *see also Carroll v.

Comm'r of Soc. Sec.*, No. 1:16 CV 2875, 2018 U.S. Dist. LEXIS 9815, at *16 (N.D. Ohio Jan. 5,

2018).

A review of the ALJ's decision indicates that the ALJ considered Cosiano's PTSD at

later steps in the sequential evaluation.  At Step Three, the ALJ indicated that she considered

"[t]he severity of the claimant's mental impairments … singly and in combination."  (Tr. 17).

And at Step Four, the ALJ acknowledged that PTSD was one of the impairments upon which

Cosiano sought disability and discussed Cosiano's PTSD treatment and symptoms in her

summary of the evidence.  (Tr. 19-21, 23).  That the ALJ didn't discuss Listing 12.15 or impose greater limitations in the RFC specific to Cosiano's PTSD relates to the propriety of the ALJ's findings at Step Three and Step Four – how well she considered Cosiano's PTSD at those later steps; not whether she neglected to consider her PTSD at all.  For purposes of the ALJ's findings at Step Two, the ALJ's consideration of Cosiano's PTSD was sufficient.  *See Nejat*, 359 F. App'x at 577.  Thus, the ALJ applied proper legal standards in her Step Two assessment of Cosiano's mental health impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241

### C.    Step Two: Fibromyalgia

Cosiano likewise argues that the ALJ erred when she determined that Cosiano's fibromyalgia was not a medically determinable impairment at Step Two.  ECF Doc. 12 at 22-24. Cosiano argues that the ALJ ignored evidence that would have satisfied the criteria for a medically determinable impairment of fibromyalgia, such as: (i) her diagnosis; (ii) her history of widespread pain and weakness in all quadrants of her body; (iii) her chronic fatigue, poor sleep, pain, myalgia, diminished light touch sensation, memory issues, and "fibro fog"; and (iv) her associated limitations in her ability to shower, walk, and perform activities of daily living.  ECF Doc. 12 at 22-23.  Cosiano argues the ALJ's omission was harmful because the ALJ did not conduct the required analysis for fibromyalgia at Step Three or adequately consider her fibromyalgia at Step Four.  ECF Doc. 12 at 23-24.

The Commissioner argues that the ALJ reasonably concluded Cosiano's fibromyalgia was not a medically determinable impairment because Cosiano did not demonstrate that she satisfied either of the diagnostic criteria.  ECF Doc. 12 at 19-21.  The Commissioner alternatively argues that any error in the ALJ's Step Two findings was harmless because the ALJ considered fibromyalgia at the remaining steps of the sequential evaluation.  ECF Doc. 12 at 21.

And the Commission argues that Cosiano hasn't indicated what additional functional limitations were warranted on account of her fibromyalgia.  *Id.*

In her reply brief, Cosiano reiterates her argument that her fibromyalgia was a medically determinable impairment, adding that, although she does not contend that she meets or equals any Listing as a result, the ALJ should have reached an RFC limiting her to sedentary work. ECF Doc. 14 at 5-6.

As discussed above, at Step Two, a claimant must show that she has a "severe" medically determinable impairment.  20 C.F.R. § 404.1520(a)(ii).  A condition must qualify as a "medically determinable impairment" before the ALJ determines whether it is "severe."  20 C.F.R. § 404.1521.  And whether a condition qualifies as a "medically determinable impairment" is determined exclusively on the basis of objective medical evidence.  *Id.*  ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  If the ALJ concludes that a condition is not a "medically determinable impairment," the ALJ need not consider the condition in assessing the RFC.  *Rouse v. Comm'r of Soc. Sec.*, No. 2:16-cv-0223, 2017 U.S. Dist. LEXIS 6172, at *11 (S.D. Ohio Jan. 17, 2017).

Social Security Ruling 12-2p provides guidance on how the agency determines whether fibromyalgia is a medically determinable impairment.  *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398 (6th Cir. 2016).  Under that ruling, a claimant has a medically determinable impairment of fibromyalgia if: (i) a physician diagnosed the claimant with fibromyalgia after a physical exam and review of her medical history; (ii) the diagnosing physician presents evidence that satisfies the Section II.A or Section II.B criteria; and (iii) the physician's diagnosis is not inconsistent with other evidence in the record.  SSR 12-2p, 2012 SSR LEXIS 1, at *3-4.

Sections II.A. and II.B of SSR 12-2p establish two alternative sets of criteria for establishing fibromyalgia as a medically determinable impairment.  *Id.* at *4.  The Section II.A. criteria require: (i) a history of widespread pain; (ii) at least 11 positive tender points, which must be found bilaterally and above and below the waist; and (iii) evidence that other disorders that could cause the claimant's symptoms or fibromyalgia signs were excluded.  *Id.* at *6-7.  The Section II.B. criteria require: (i) a history of widespread pain; (ii) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (iii) evidence that other disorders that could cause those repeated manifestations were excluded.  *Id.* at *7-9.

As a threshold matter, Cosiano's argument requires some clarification.  Cosiano cites the Section II.A. criteria and claims that the ALJ ignored evidence that would have established Cosiano's fibromyalgia as a medically determinable impairment.  ECF Doc. 12 at 5.  However, Cosiano hasn't disputed the ALJ's finding that there no physical exams on record documenting 11 positive tender points.  That alone would preclude a finding that the Section II.A. criteria were established.  *See id.*  Cosiano instead argues that the ALJ failed to consider evidence of fibromyalgia symptoms, which would be relevant to the Section II.B. criteria.  *Compare* ECF Doc. 12 at 5, *and* ECF Doc. 14, *with* SSR 12-2p, 2012 LEXIS 1, at *8 nn. 9 & 10.

With that clarification in mind, I find that the ALJ failed to apply proper legal standards in her evaluation of Cosiano's fibromyalgia at Step Two.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In making her Step Two findings, the ALJ stated:

> While [Cosiano] has a diagnosis of fibromyalgia from an acceptable medical source, there must be appropriate clinical signs or laboratory findings to support that diagnosis.  The law recognizes two different diagnostic criteria.  The first requires 11 positive tender points out of 18, a three month history of generalized pain, and evidence that other disorders had been excluded.  The second requires a history of widespread pain, repeated manifestation of at least six fibromyalgia signs or symptoms, and evidence that other disorders had been excluded.  In addition, the diagnosing physician must have done a review of the claimant's

record.  (SSR 12-2p)  In this case, no requisite exam is in the file.  In September of 2016, Dr. Khan noted that the claimant has "trigger points in her cervical region, lumbar, and gluteal region."  However, no trigger point exam was recorded, and 11 trigger points were not noted (18F/8; 1F/18 [Tr. 406, 1262]).  A physical exam in May of 2020 only noted one trigger point (23F/19 [Tr. 1409]).  There is no evidence that other disorders were excluded.  Based on those factors, [Cosiano's] fibromyalgia is not medically determined.

(Tr. 16).  The ALJ accurately summarized the criteria for both Section II.A. and Section II.B. *Id.*; *cf.* SSR 12-2p, 2012 SSR LEXIS 1, at *6-9.  And the ALJ explained the basis for her findings in sufficient terms to allow the court to follow: (i) the Section II.A. criteria were not satisfied because there were no physical examination findings on record documenting 11 positive tender points; and (ii) neither set of criteria were satisfied because there was no evidence that other disorders were excluded.  (Tr. 16); *Fleisher*, 744 F. Supp. 2 at 877.

Although Cosiano argues that the ALJ erred by not considering evidence of her fibromyalgia symptoms, the ALJ's finding that there was no evidence that other disorders were excluded would alone be dispositive of the issue whether the Section II.B. criteria were satisfied. The ALJ's finding that no other disorders were excluded, however, was broader than what the evidence would support.  Dr. Askari specifically ordered more testing to rule out rheumatological disease and sacroiliitis as responsible for Cosiano's symptoms.  (Tr. 405).  And Dr. Askari ruled out synovitis, inflammatory disease, and auto-immune disease as possible causes.  (Tr. 398-99).

The Commissioner argues that Dr. Askari's diagnosis was insufficient because he only "ruled out a rheumatological cause for Plaintiff's tenderness, numbness/tingling, and myalgias" and "did not speak to the other signs and symptoms Plaintiff cited."  ECF Doc. 13 at 20-21. In other words, the Commissioner argues that Dr. Askari only ruled out other disorders for *three* fibromyalgia symptoms, signs, and co-occurring conditions, and not *six*.  *See* SSR 12-2p, 2012

SSR LEXIS 1, at *8 n.9 (listing muscle pain, muscle weakness, and numbness or tingling as fibromyalgia symptoms). However, Dr. Askari's treatment notes also mention Cosiano's symptoms of chronic fatigue/low energy and Cosiano's anxiety/depression. (Tr. 392, 399-400). Manifestations of fatigue, depression, and anxiety disorder are all separate fibromyalgia symptoms, bringing the total symptoms considered by Dr. Askari to at least *six*. SSR 12-2p, 2012 SSR LEXIS 1, at *8. If the ALJ had interpreted Dr. Askari's treatment notes the way the Commissioner does, it was incumbent upon the ALJ to say so. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Inst. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself."). Instead, the ALJ made the much broader statement that there was "no evidence that other disorders were excluded" without explaining why the same treatment notes she cited did not constitute evidence that other disorders were excluded. Thus, the ALJ erred in concluding that Cosiano's fibromyalgia was not a medically determinable impairment.

Although a close call, I nevertheless find that the ALJ's Step Two error was harmless because the ALJ considered Cosiano's fibromyalgia at later steps of the sequential analysis. *Nejat*, 359 F. App'x at 577. On the one hand, the ALJ didn't mention Cosiano's fibromyalgia in her Step Three analysis. *See* (Tr. 17-18). And because the ALJ determined that Cosiano didn't have a medically determinable impairment of fibromyalgia, she was not required to consider it in determining Cosiano's RFC at Step Four. *See Rouse*, No. 2:16-cv-0223, 2017 U.S. Dist. LEXIS 6172, at *11; *see also, e.g.*, *Wood v. Berryhill*, No. 3:17CV2620, 2018 U.S. Dist. LEXIS 223361, at *63 (N.D. Ohio Nov. 9, 2018); *Herzog v. Comm'r of Soc. Sec.*, No. 2:16-cv-244, 2017 U.S. Dist. LEXIS 161575, at *9 (S.D. Ohio Sept. 28, 2017). At Step Four, the ALJ found that although Cosiano's "medically determinable impairments could reasonably be expected to cause

34

the alleged symptoms," her subjective symptoms statements were not entirely consistent with the medical evidence, which would imply that Cosiano's statements about her fibromyalgia symptoms were not evaluated on the basis of their consistency with a medically determinably impairment of fibromyalgia.  (Tr. 19).  And the ALJ didn't say whether she considered Cosiano's fibromyalgia under SSR 12-2p, which, as noted above, provides specific guidance for evaluating fibromyalgia at Step Four.  SSR 12-2p, 2012 SSR LEXIS 1, at *17-20.

On the other hand, the ALJ concluded at Step Three that Cosiano did not have an impairment or combination of impairments that met or medically equaled the criteria of a listed impairment.  (Tr. 17).  There is no Listing for fibromyalgia.  SSR 12-2p, 2012 SSR LEXIS 1, at *16-17 ("FM cannot meet a listing in appendix 1 because FM is not a listed impairment.").  And Cosiano hasn't contended that that she met or equaled a listed impairment because of her fibromyalgia.  ECF Doc. 14 at 6.

Further, at Step Four, the ALJ expressly mentioned Cosiano's fibromyalgia, discussed Cosiano's fibromyalgia treatment in her summary of the medical records, and adopted the state agency consultants' opinion that Cosiano's fibromyalgia flareups did not constitute new material evidence that would warrant departure from the January 21, 2016 RFC.  (Tr. 17-24).  And although the ALJ never explicitly analyzed Cosiano's fibromyalgia under SSR 12-2p, the ALJ applied SSR 96-7p by way of its successor, SSR 16-3p, which is what SSR 12-2p requires. *Luukkonen*, 653 F. App'x at 399-400; SSR 12-2p, 2012 SSR LEXIS 1, at *13; SSR 16-3p, 2016 SSR LEXIS 4, at *1; (Tr. 18-19).

On balance, I find that this is not a case in which the ALJ completely failed to consider limitations resulting from Cosiano's fibromyalgia at later steps of the sequential evaluation process.  *Cf. Bush v. Comm'r of Soc. Sec.*, No. 3:17-cv-333, 2019 U.S. Dist. LEXIS 56191, at

*10-12 (S.D. Ohio Apr. 1, 2019); *Wood*, No. 3:17CV2620, 2018 U.S. Dist. LEXIS 223361, at

*63; *Howell v. Comm'r of Soc.*, No. 1:17 CV 316, 2018 U.S. Dist. LEXIS 11561, at *30 (N.D.

Ohio Jan. 9, 2018).  Although the propriety of the ALJ's assessment of Cosiano's fibromyalgia at

those later steps might not have fully complied with the regulations, that did not render the ALJ's

Step Two error a basis for remand.  *See Nejat*, 359 F. App'x at 577; *see also Landefeld v.

Comm'r of Soc. Sec.*, No. 2:15-cv-880, 2015 U.S. Dist. LEXIS 164180, at *19-20 (S.D. Ohio

Dec. 8, 2015).

    **D.**    **Step Three: Listing 1.04A**

Cosiano argues that the ALJ failed to apply proper legal standards or reach a decision

supported by substantial evidence when she determined that Cosiano did not meet or equal the

criteria for Listing 1.04A.  ECF Doc. 12 at 24-25.  Cosiano argues that she meets or equals the

Listing 1.04A criteria because she has: (i) a history of nerve root compromise; (ii) nerve root

compression characterized by neuro-anatomic distribution of pain; (iii) positive straight leg tests;

(iv) an inability to ambulate effectively; and (v) severe back and hip pain.  ECF Doc. 12 at 25.

The Commissioner disagrees, arguing that the evidence did not show loss of spinal range

of motion, positive sitting *and* supine straight leg raise tests, or definitive motor loss in the left

leg.  ECF Doc. 13 at 22-23.  Cosiano's reply brief largely reiterates her opening brief argument.

ECF Doc. 14 at 7.

At Step Three, a claimant has the burden to show that she has an impairment or

combination of impairments that meets or medically equals the criteria of an impairment listed in

20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001);

20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment,

she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e);

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Under the regulatory framework existing at the time of the ALJ's decision, Listing 1.04 was used to determine whether a claimant's spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04 (2019).[7]

The ALJ failed to apply proper legal standards in evaluating whether Cosiano had an impairment that met or equaled Listing 1.04A.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ's discussion of Listing 1.04A was limited to the following:

> [Cosiano's] degenerative disc disease does not meet Listing 1.04 because the record does not demonstrate compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of

---

[7] On December 3, 2020, the Social Security Administration revised the medical criteria for evaluating musculoskeletal disorders.  85 FR 78164 (Dec. 3, 2020).  Under the revised Listings, Listing 1.04 has been replaced by Listing 1.15, which has different criteria than Listing 1.04.  *Compare*, 85 FR 78164 *78179-80, with* 20 C.F.R. pt. 404, Subpt. P., App. 1 § 1.04 (2019).  The revised Listings were effective April 2, 2021 and were only given prospective application.  85 FR 78164 *78164.  Thus, we must apply the regulations in effect at the time of the ALJ's decision in reviewing her Step Three determination. *Jones v. Comm'r of Soc. Sec.*, No. 1:17 CV 662, 2018 U.S. Dist. LEXIS 143590, at *24 (N.D. Ohio Aug. 23, 2018).

> motion of the spine, motor loss (atrophy with associated muscle weakness)
> accompanied by sensory or reflex loss and, if there is involvement of the lower
> back, positive straight-leg raising.

(Tr. 17).  Notably absent from that discussion is a comparison between the listing criteria and the

evidence or any evidence to the support the ALJ's findings.  *Reynolds*, 424 F. App'x at 416.  The

ALJ merely concluded that the record did not establish the criteria for Listing 1.04A, which

frustrates our ability to determine whether substantial evidence supported the ALJ's decision.  *Id.*

An articulation error at Step Three, however, can be harmless if the claimant did not put

forth sufficient evidence to demonstrate that she meets the listing criteria.  *Forrest*, 591 F. App'x

at 366.  Independent review of the medical record indicates there is evidentiary support for some

but not all of the listing criteria.  Cosiano's June 20, 2019 MRI results and Dr. Hoffer's July 1,

2019 neurosurgical evaluation would support a finding that Cosiano had compromise of the

nerve root with evidence of nerve root compression and neuro-anatomic distribution of pain

(radiculopathy). (Tr. 672, 1381); *see also Haywood v. Colvin*, No. 2:14-00092, 2016 U.S. Dist.

LEXIS 66329, at *19 n.15 (M.D. Tenn. Mar. 4, 2016) ("The expression 'neuro-anatomic

distribution of pain' in Listing 1.04(A) is, in medical terms, lumbar radiculopathy.").  Cosiano

also repeatedly demonstrated limited spine range of motion and sensory loss.  (Tr. 594, 598, 602,

606, 615-16, 620, 628-29, 633-34, 638, 1201, 1393).  However, there are no medical records

documenting atrophy.  *Cf.* (Tr. 594, 598, 602, 606, 611, 633 (objective exam findings of normal

muscle bulk and strength)).  And although there was positive leg raise tests in the medical record,

they did not specify whether they were conducted in both supine and sitting positions.  *See* (Tr.

1201, 1324).

Because Cosiano failed to put forward sufficient evidence to demonstrate that she met, or

possibly could meet, the criteria for Listing 1.04A, the ALJ's failure to articulate sufficiently her

reasons for her Step Three findings was harmless and, by extension, Cosiano has not established

a basis for remand on account of the ALJ's Step Three analysis of Listing 1.04A.  *See Forrest*,

591 F. App'x at 366; *see also*, *e.g.*, *Faulkner v. Comm'r of Soc. Sec.*, No. 2:20-cv-5136, 2021

U.S. Dist. LEXIS 197826, at *14 (S.D. Ohio Oct. 14, 2021); *Walden v. Comm'r of Soc. Sec.*, No.

1:19-cv-00288, 2021 U.S. Dist. LEXIS 18100, at *21-25 (E.D. Tenn. Feb. 1, 2021); *Clanton v.*

*Comm'r of Soc. Sec.*, No. 1:14-CV-1039, 2016 U.S. Dist. LEXIS 921, at *13 (W.D. Mich. Jan. 6,

2016).

### E.    Step Four: RFC

Cosiano argues that the ALJ failed to apply proper legal standards and reach a decision

supported by substantial evidence in making her RFC findings.  ECF Doc. 12 at 26-29.  Cosiano

argues that the ALJ's assessment of her physical RFC didn't adequately account for her

musculoskeletal impairments, which limited her to less than a sedentary level of exertion.  ECF

Doc. 12 at 27.  Cosiano argues that the ALJ's assessment of her mental RFC didn't adequately

account for her mental impairments, which inhibited her ability to maintain attention and

concentration and interact with others.  ECF Doc. 12 at 28.  Cosiano argues that according to the

vocational expert's testimony, someone who required redirection six to eight times per day (as a

result of her memory and concentration problems) would not be able to work competitively.  *Id.*

Cosiano argues that her absenteeism and off-task behavior (the need to lie down or elevate her

legs) would, according to the vocational expert's testimony, preclude competitive employment.

ECF Doc. 12 at 27-28.  And Cosiano argues that the ALJ failed to consider her need to cycle

between sitting and standing.  ECF Doc. 12 at 28-29.

The Commissioner disagrees, arguing that Cosiano failed to show that the medical record

supported greater functional limitations in the RFC.  ECF Doc. 13 at 23-25.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5 at *14.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5 at *13-14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15.  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 404.1529(c)(3).

If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  But the ALJ need not explicitly discuss each of the regulatory factors. *See Renstrom v. Astrue*, 680 F.3d

40

1057, 1067 (8th Cir. 2012).  And although the ALJ must discuss significant evidence supporting

her decision and explain her conclusions with sufficient detail to permit meaningful review, there

is no requirement that the ALJ incorporate all the information upon which she relied into a single

tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir.

2010).

### 1.    Mental Impairments

The ALJ applied proper legal standards and reached a decision supported by substantial

evidence in evaluating Cosiano's subjective symptom complaints regarding her mental health

impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the

regulations by: (i) assessing Cosiano's mental RFC in light of the medical evidence, her

testimony, and other evidence in the record; and (ii) clearly explaining that she rejected

Cosiano's subjective symptom complaints because her statements regarding the intensity,

persistence, and limiting effects of her symptoms were inconsistent with the record evidence.  20

C.F.R. § 1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4, 11-12-15; SSR 96-8p, 1996 SSR

LEXIS 5, at *13-15; (Tr. 18-24).  The ALJ provided sufficiently clear reasons for rejecting most

of Cosiano's subjective symptom complaints when she stated that:

> Mentally, [Cosiano] stated that she cries most days in depression.  … [M]ental
> status exams noted her depression and anxiety.  She had a congruent affect.
> Language was normal.  Thought process was goal-directed.  Associations were
> intact.  Fund of knowledge was average.  Memory was fair.  She had a limited
> insight and good judgment.  Her subjective complain[t]s of remembering and her
> limited insight on exam, support simple, routine tasks, but not at a production rate
> pace.  She is limited to occasional workplace changes, as her depression and
> anxiety symptoms were noted during psychiatric treatment.

(Tr. 23-24).  In essence, the ALJ determined that Cosiano's subjective symptoms complaints

were inconsistent with the generally unremarkable mental status exam findings.  That finding

was supported by substantial evidence.  *See* (Tr. 19-22); *see also* (Tr. 1043-44, 1049-50, 1055-

41

56, 1061-62, 1066-67, 1073-74, 1393, 1395-97, 1400, 1403, 1405, 1418, 1421, 1424, 1451-52, 1441, 1444, 1446-47, 1454, 1457, 1460).

The ALJ's explanation of her mental RFC findings, however, did not address Cosiano's trauma-related symptoms that would affect her ability to interact with supervisors, coworkers, and the general public.  However, the ALJ's summary of the medical evidence includes findings that would be inconsistent with Cosiano's current argument that her PTSD would result in greater limitations in her ability to interact with others.  *See Buckhannon ex rel.*, 368 F. App'x at 678–79.  Specifically, the ALJ noted that Cosiano reported that: (i) she went to a Halloween party and had a great time; and (ii) on another night Cosiano attended her brother-in-law's band and sat with other in-laws and their friends.  (Tr. 19); *see* (Tr. 783).  And in discussing medical records pertaining to Cosiano's trauma, the ALJ noted that Cosiano was cooperative.  (Tr. 20-21).  Moreover, the vocational expert testified that a hypothetical person with Cosiano's RFC could still perform work as a marker and garment sorter if the RFC were restricted to "superficial interactions with coworkers and the general public."  (Tr. 62-63).

Because the ALJ applied proper legal standards and her conclusions were reasonably drawn from the evidence, the ALJ's evaluation of Cosiano's subjective symptom complaints of her mental impairments fell within the Commissioner's "zone of choice" and cannot be disturbed by this court.  *Mullen*, 800 F.2d at 545; *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

### 2.      Physical Impairments

The ALJ failed to apply proper legal standards in evaluating Cosiano's physical impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ discounted Cosiano's subjective symptom complaints of Cosiano's physical impairments, reasoning:

> Objective imaging demonstrated a new L5-[S]1 left paracentral disc herniation with nerve root compression. There were 2 areas with subcentimeter mass within the cauda equin[a]; however, they were stable compared to a scan from 2014. On examination, [Cosiano] had very mild tenderness in the low lumbar region. Strength in her right leg was full. She ambulated with normal gait, though slowly. Due to [Cosiano's] seizures, [she] must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving. Her pain symptomology, along with the opinion of Dr. Tani, support [a finding] that [Cosiano] can occasionally stoop, kneel, crouch, and crawl. [Cosiano] was able to ambulate with a tandem gait, but slowly, supporting occasional ramps and stairs, but never climbing ladders, ropes, and scaffolds.

(Tr. 23).[8] Similar to Cosiano's mental health impairments, the ALJ relied on unremarkable physical examination findings to discount the severity of Cosiano's subjective symptom complaints. Such reasoning would be adequate to address Cosiano's symptoms resulting from her musculoskeletal impairments, and it was supported by substantial evidence. *See* (Tr.18-22); *see also* (Tr. 1381, 1393, 1405-06, 1418-19, 1422, 1425, 1441, 1444, 1447, 1451-52, 1457-58, 1460-61).

The same is not true, however, with regard to Cosiano's fibromyalgia. As discussed above, the ALJ arguably erred in determining that Cosiano's fibromyalgia was not a medically determinable impairment, but the error was harmless simply because the ALJ considered Cosiano's fibromyalgia at later steps, including Step Four. However, that doesn't mean that the ALJ didn't err at all in considering Cosiano's fibromyalgia at later steps.

Fibromyalgia is an 'elusive' and 'mysterious' disease." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Unlike other medical conditions, "fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

---

[8] The ALJ adopted the January 21, 2016 physical RFC after determining that there was no new material evidence. (Tr. 23); *cf.* (Tr. 87-88). Cosiano has not contested the ALJ's application of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), as modified by *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), to her DIB and SSI applications.

Consequently, objective tests (upon which the ALJ primarily relied) are of little relevance to determining its severity.  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011); *Preston v. Sec'y of Health and Hum. Servs.*, 854 F.2d 815, 820 (6th Cir. 1988); *see also Canfield v. Comm'r of Soc. Sec.*, No. 01-CV-73472-DT, 2002 U.S. Dist. LEXIS 18921, at *4 (E.D. Mich. Sept. 13, 2002) ("It is … nonsensical to discount a fibromyalgia patient's subjective complaints on the grounds that objective medical findings are lacking.").  And fibromyalgia's unique nature, in which subjective pain complaints play an important role, makes "providing justification for discounting a claimant's statements … particularly important."  *Rogers*, 486 F.3d at 248.

The ALJ's sweeping rationale failed to meaningfully address Cosiano's fibromyalgia, and the ALJ's summary of the evidence and discussion of the opinion evidence doesn't indicate otherwise.  This is where the ALJ's questionable conclusion that Cosiano's diagnosed fibromyalgia was not a medically determinable impairment has its impact.  The ALJ's discussion of the evidence emphasized normal physical examination results, which, as stated above, is not an appropriate basis upon which to discount pain symptoms associated with fibromyalgia. *Rogers*, 486 F.3d at 248; (Tr. 18-22).  She also noted that Cosiano was able to resume normal activities of daily living, was encouraged to walk her dog, and was able to participate in social events.  (Tr. 19, 22).  But "the fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patient's symptoms."  *Rogers*, 486 F.3d at 249.  And normal activities of daily living aren't "comparable to typical work activities," especially considering Cosiano's testimony that: (i) she couldn't lift a laundry basket, bend at all, sit for long periods of time, and walk her dog for more than five houses down the street; (ii) she spent her leisure time looking at the flower bed, reading, watching television, or napping;

(iii) she needed to alternate between sitting and standing and needed to have her legs raised; and (iv) her fibromyalgia flareups exacerbated her pain and numbness.  (Tr. 49-55); *see Rogers*, 486 F.3d at 248.

Dr. McKee, whose opinion the ALJ found persuasive, merely adopted the January 21, 2016 RFC without explaining why Cosiano's new fibromyalgia diagnosis and treatment was not materially different from the prior ALJ's decision.  (Tr. 22-23, 110).  Dr. Sutherland, whose opinion the ALJ also found persuasive, merely noted that Cosiano hadn't started aqua therapy and had normal gait and sensation.  (Tr. 139).  Dr. Tani didn't express herself on whether Cosiano had functional limitations as a result of her fibromyalgia, and yet the ALJ found that her opinion supported a finding that fibromyalgia was not a medically determinable impairment. (Tr. 23, 740-43).  Contrary to the ALJ's decision, Dr. Tani didn't say she didn't know whether Cosiano had a fibromyalgia diagnosis; rather, she said she didn't know whether Cosiano met the "American College of Rheumatology criteria for fibromyalgia" and clarified that she only treated Cosiano's neurological problems.  (Tr. 740).

The ALJ was required to provide "specific reasons" for the weight given to Cosiano's symptoms in sufficiently clear terms for Cosiano and the court to assess.  SSR 16-3p, 2016 SSR LEXIS 4, at *26.  The ALJ didn't do so.  Therefore, I recommend that the ALJ's decision be remanded so that the ALJ better articulate her consideration of Cosiano's fibromyalgia.  *See Keller v. Comm'r of Soc. Sec.*, No. 2:18-cv-341, 2019 U.S. Dist. LEXIS 12829, at *29 (S.D. Ohio Jan. 28, 2019); *Herzog*, No. 2:16-cv-244, 2017 U.S. Dist. LEXIS 82965, at *28.  If the Court accepts this recommendation, I further recommend that the ALJ reassess Cosiano's fibromyalgia at both Step Two and Step Four.  In all other respects, I recommend the ALJ's decision be affirmed.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in explaining how she evaluated Cosiano's subjective symptom complaints, I recommend that the Commissioner's final decision denying Cosiano's applications for DIB and SSI be vacated and that Cosiano's case be remanded for further consideration.

Dated: April 19, 2022

Thomas M. Parker
United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).